# United States Court of Appeals

*for the*

# Third Circuit

Case No. 26-1001

SEAN CURRAN; DELAWARE ADAPT; FREEDOM CENTER FOR INDEPENDENT LIVING; UNITED SPINAL ASSOCIATION; NATIONAL COUNCIL ON INDEPENDENT LIVING; NOT DEAD YET; and INSTITUTE FOR PATIENTS' RIGHTS,

*Plaintiffs-Appellants,*

– v. –

GOVERNOR OF DELAWARE; DELAWARE DEPARTMENT OF HEALTH & SOCIAL SERVICES; SECRETARY DELAWARE DEPARTMENT OF HEALTH & SOCIAL SERVICES; DELAWARE BOARD OF MEDICAL LICENSURE AND DISCIPLINE; JOSEPH PARISE, D.O. in his official capacity as President of the Medical Board Licensure and Discipline; JACQUELINE MAINWARING, CRNA, APRN in her official capacity as President of the Delaware Board of Nursing; and DELAWARE BOARD OF NURSING,

*Defendants-Appellees.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE IN NO. 1:25-CV-01475, HONORABLE GREGORY B. WILLIAMS, U.S. DISTRICT JUDGE

## APPELLANTS' REPLY BRIEF

THEODORE A. KITTILA
WILLIAM E. GREEN, JR.
HALLORAN FARKAS + KITTILA LLP
5722 Kennett Pike
Wilmington, Delaware 19807
(302) 257-2025

ERNEST J. GALVAN
MICHAEL W. BIEN
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105
(415) 433-6830

*Attorneys for Appellants*

CP COUNSEL PRESS (800) 4-APPEAL • (392247)

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

ARGUMENT ..... 4

I. THE DISTRICT COURT ERRED BY FINDING THAT MR. CURRAN DID NOT HAVE STANDING TO BRING THE CLAIMS ..... 4

STANDARD OF REVIEW ..... 4

DISCUSSION ..... 4

A. Mr. Curran is Eligible to Receive Life-Ending Drugs Under the Act ..... 5

B. Mr. Curran's Injury is Not Speculative ..... 9

C. Mr. Curran Has Established Causation ..... 11

D. The District Court Erred by Not Giving an Opportunity to Amend ..... 11

II. THE DISTRICT COURT ERRED BY FINDING THAT APPELLANT ORGANIZATIONS DID NOT HAVE STANDING TO BRING THE CLAIMS ..... 12

STANDARD OF REVIEW ..... 12

DISCUSSION ..... 12

A. The Appellant Organizations Have Organizational Standing ..... 13

B. The Appellant Organizations Have Associational Standing ..... 17

III. THE DISTRICT COURT ERRED WITH RESPECT TO ITS DENIAL OF THE TRO ON THE MERITS .....18

STANDARD OF REVIEW .....18

DISCUSSION .....19

A. This Court Has Jurisdiction to Review the District Court's Denial of the TRO Motion .....19

B. The District Court Erred by Deciding the TRO Motion on the Merits After Determining that Appellants Did Not Have Standing .....21

C. The District Court Erred in Denying the TRO and Dismissing the Case Based on Its Review of the Merits .....22

1. Statutory Claims .....23

2. Constitutional Claims .....25

CONCLUSION .....27

CERTIFICATION OF BAR MEMBERSHIP

CERTIFICATION OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1789 Foundation, Inc. v. Schmidt*,
2024 WL 4666300 (M.D. Pa. Nov. 4, 2024) ....................17

*A.A. v. Att'y Gen. of the United States*,
973 F.3d 171 (3d Cir. 2020) ....................5

*Am. Legal Found. v. F.C.C.*,
808 F.2d 84 (D.C. Cir. 1987) ....................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................22

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................22

*Bost v. Illinois State Bd. of Elections*,
607 U.S. ---, 146 S. Ct. 513 (2026) ....................18

*Bryman v. Murphy*,
161 F.4th 174 (3d Cir. 2025) ....................25-26

*Cottrell v. Alcon Laboratories*,
874 F.3d 154 (3d Cir. 2017) ....................21

*Diamond Alternative Energy, LLC v. Envtl. Prot. Agency*,
606 U.S. 100 (2025) ....................18

*Durham v. Kelley*,
82 F.4th 217 (3d Cir. 2023) ....................23-24

*Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*,
482 F.3d 247 (3d Cir. 2007) ....................11

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ....................15

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ....................12

*Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274 (1986)....17

*Jones v. CVS Pharmacy, Inc.*, 2022 WL 4536124 (M.D. Pa. Sept. 28, 2022)....23

*LabMD Inc. v. Boback*, 47 F.4th 164 (3d Cir. 2022)....11

*LaSpina v. SEIU Pennsylvania State Council*, 985 F.3d 278 (3d Cir. 2021)....12

*Light v. Davis*, 2024 WL 4144066 (3d Cir. Sept. 11, 2024)....21

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)....4, 15, 16

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)....16

*Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004)....18

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)....22, 23

*New Jersey Bankers Ass'n v. Att'y Gen. New Jersey*, 49 F.4th 849 (3d Cir. 2022)....7

*Newark Branch, N.A.A.C.P. v. Town of Harrison*, 907 F.2d 1408 (3d Cir. 1990)....16-17

*Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301 (1985)....19

*Riccio v. Sentry Credit, Inc.*, 954 F.3d 582 (3d Cir. 2020)....7

*Robinson v. Lehman*, 771 F.2d 772 (3d Cir. 1985)....19-20

*United States v. Florida*,
--- F.4th ---, 2026 WL 879178 (11th Cir. Mar. 31, 2026) ................................10

*United Spinal Assoc. v. California*,
2024 WL 1671167 (D.C. Ca. Mar. 27, 2024)....................................................25

*United Spinal Assoc. v. California*,
Case No. 24-04751 (9th Cir.) ..........................................................................25

*Vorchheimer v. Phila. Owners Ass'n*,
903 F.3d 100 (3d Cir. 2018) ...........................................................................12

*Warth v. Seldin*,
422 U.S. 490 (1975).........................................................................................12

*Winslow v. Stevens*,
632 F.App'x. 721 (3d Cir. 2015) .....................................................................12

*Wishkin v. Potter*,
476 F.3d 180 (3d Cir. 2007) ...........................................................................23

*Warren Gen. Hosp. v. Amgen Inc.*,
643 F.3d 77 (3d Cir. 2011) .............................................................................18

*Washington v. Glucksberg*,
521 U.S. 702 (1997).........................................................................................26

**Federal Constitution, Statutes, and Rules**

U.S. Const. amend. XIV, § 1 ...........................................................................*passim*

Fed. R. Civ. P. 12 ..........................................................................18, 20, 22

Fed. R. Civ. P. 65 ...........................................................................................22

**Delaware Constitution and Statutes**

Del. State Const. of 1897 (as amended)...........................................................20

11 *Del. C.* § 645 ..................................................................................................2

16 *Del. C.* § 2501C, *et seq.* .........................................................................*passim*

**Other Authorities**

Elissa Kolva, Barry Rosenfeld, & Rebecca Saracino, *Assessing the decision making capacity of terminally ill patients with cancer*, 26 AM J GERIATRIC PSYCHIATRY 5 (2018) ............ 10

James Madison, *The Federalist No. 51* ............ 8

11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2962 (1983) ............ 20

# INTRODUCTION

Delaware's End of Life Options Act is a discriminatory and dangerous law. While Appellees[1] have done their best in their Answering Brief ("AB") to try to paint the Act as a "comprehensive" regime that "ensure[s] that every qualified patient's decision to obtain and self administer the [aid-in-dying] medication is made voluntarily and on an informed decision" (AB 4) their arguments come up decidedly short. Appellants should have had their day in Court to present real evidence that the Act is facially discriminatory and unconstitutional.

In *sua sponte* dismissing the case for lack of standing and on the merits, the District Court blocked Appellants from presenting factual testimony regarding the harm caused by the Act to Appellants. Instead, the District Court improperly accepted the State's assertions that the Act had adequate safeguards and advanced an objective that was protected under a rational basis review. With respect to standing, the District Court viewed Appellants as little more than interlopers seeking to impose their viewpoints on unwilling citizens.

The Appellees' Answering Brief makes clear that the Act is poorly written legislation which automatically labels Appellants as being suicide-eligible. In addressing Appellants challenges to the statutory language, Appellees run from the

---

[1] Capitalized terms not otherwise defined herein shall have the same meaning ascribed to them as in Appellants' Opening Brief ("OB").

plain text of the statute and its broad definition of terminal illness and ask this Court to save the statute by rewriting it. Appellees argue that the Court simply needs to add words that are not there requiring medical providers to consider the effect of ongoing medical support before deciding that someone is terminal, or even worse, to just trust that medical providers will not act to hasten a terminal diagnosis (despite the evidence that this is precisely what is occurring in other states). *See* AB at n.1.

Even more shocking, however, is the Appellees' assertion that a further safeguard from abuse is built into the State of Delaware's existing law: Because Delaware still criminalizes the promotion of suicide (*see* 11 *Del. C.* § 645), medical providers who do not follow the letter of the Act face the possibility of imprisonment. *See* AB at n.1.[2] In short, EOLOA is so well-crafted that any failure to abide by it will lead to imprisonment.

Delaware's EOLOA is not defensible. The Act claims that doctors and other providers can make a ready determination regarding whether a person has 6 months to live. It pretends that doctors and other providers can make a determination that a person is acting "voluntarily" and on an "informed basis." It places in the hands of

[2] *See also* AB at n.9 ("[E]ven if Appellants could credibly allege that under the Act, some terminally ill patients might be steered by their physicians, in violation of the Act ***and at the risk of imprisonment***, to end their lives when that decision is not competently made or is otherwise against their … wishes, Appellants cannot show that all applications of the Act would result in such involuntary decisions.") (emphasis added).

two persons—who may or may not have had a previous relationship with the patient—the determination that the patient "has decision-making capacity" and that such person "is not being coerced." Appellants have pled in their Complaint that none of these suppositions is supported by medical science nor the experience of nearly identical legislation in other states.

The fact remains that the Act is facially discriminatory and is causing real harm to people like Appellants. The discrimination experienced is "concrete and particular," and the injury is "actual," "not conjectural or hypothetical." Appellants have standing and should have been given their day in Court. The denial of the TRO Motion on the merits was erroneous. The District Court's decision should be reversed.

# ARGUMENT

## I. THE DISTRICT COURT ERRED BY FINDING THAT MR. CURRAN DID NOT HAVE STANDING TO BRING THE CLAIMS.

### STANDARD OF REVIEW

The parties agree that the standard of review on the standing determinations is plenary. AB at 12.

### DISCUSSION

In *Lujan v. Defenders of Wildlife*, the Supreme Court stated, "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing. 504 U.S. 555, 561 (1992). Mr. Curran needed to plead a "concrete and particularized" injury to satisfy the requirements as standing. *Id.* He did just that: Mr. Curran described his injury as "discrimination plain and simple," and that the Act "treats [him] as a second-class citizen." A149 at ¶ 6. This was not, as Appellees suggested to the District Court, an "attenuated and hypothetical harm" that "require[s] a chain of speculative contingencies" or simply a "strong moral, ideological, or policy objection." A185-86. Because of his life-threatening disability, Mr. Curran is deemed to have a "terminal illness" which qualifies him at any time for assisted suicide under the Act. The concrete and particularized injury is the discrimination, giving Mr. Curran standing.

**A. Mr. Curran is Eligible to Receive Life-Ending Drugs Under the Act.**

In their Answering Brief, Appellees argue that Mr. Curran lacks standing because he is not eligible to receive life-ending drugs under EOLOA. AB at 14. Appellees misread the Act. The term "terminal illness" is defined under the Act as "an incurable and irreversible disease, illness, or condition that as a medical probability, will result in death within 6 months." 16 *Del. C.* § 2502C(17). Under the plain language of the Act,[3] EOLOA provides that it is the "condition" that "will result in death within 6 months" as a medical probability. The linkage is between the "condition" and "death"—full stop. This definition has no limiting language such as "without medical intervention" or "despite medical intervention."

Mr. Curran's stable condition is attributable to medical intervention. If such medical intervention were cut off, Mr. Curran would not survive 6 months. If the State of Delaware had intended to make physician assisted suicide only available to people who will not "as a medical probability" be able to survive 6 months *without medical intervention* or *despite medical intervention*, then such language would have been included in the statute. It was not.

Despite this gap in the statutory language, both the District Court and the Appellees expressed their frustration with Appellants' reading of the statute,

[3] *See A.A. v. Att'y Gen. of the United States*, 973 F.3d 171, 187 (3d Cir. 2020) ("[E]very exercise of statutory interpretation begins with an examination of the plain language of the statute.").

claiming in essence that Appellants' reading of the definition of terminal illness—despite its plain language—would lead to "absurd results." The District Court stated:

> However, Delaware's EOLOA does not broadly confer eligibility to anyone with a condition that would, as a medical probability, die within six months *without medical intervention*. Under Plaintiffs' expansive interpretation of Delaware's EOLOA, absurd results would arise, such as rendering eligible for assisted suicide those with medical ailments that can live long and vigorous lives with regular medical assistance, like type I diabetics that require regular insulin injections.

A16.

First, with respect to the District Court's determination that it must be obvious that the General Assembly did not intend certain medical ailments to qualify for EOLOA, and that any contrary interpretation would be "absurd," unfortunately, the language of the Act leads to these results. As argued in the Opening Brief, the claim that certain diseases such as diabetes could never be deemed a terminal illness under EOLOA does not match with what has occurred in other states with much longer experience in the realm of assisted suicide. *See* OB at 13 n.1 (noting that Oregon has listed "diabetes" as one of the "underlying illnesses" in assisted suicide cases in almost every year over the last 20 years). The District Court's labeling of certain diseases as obviously off-limits is not supported by experience.

Regardless, the statutory language does not contain the italicized language (*see* A16) in the District Court's opinion. The District Court's misinterpretation of EOLOA is precisely why the Act should be read using its plain language. Appellants have never argued that additional language should be added to the statute (despite Appellees' statement to the contrary).[4] The District Court accepted an interpretation that limited the Act to only cases where medical intervention is purportedly of no help to the patient's condition. That limitation is not in the Act.

Any contention that EOLOA requires a provider to consider whether medical intervention would extend one's life, or that certain illnesses, diseases, or conditions are somehow off-limits or otherwise too "absurd" to be terminal illnesses, is contrary to the plain language of the Act. "As long as the legislature 'could have any conceivable justification for a result—even if the result carries negative consequences—that result cannot be absurd.'" *See New Jersey Bankers Ass'n v. Att'y Gen. New Jersey*, 49 F.4th 849, 858 (3d Cir. 2022) (quoting *Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 588-89 (3d Cir. 2020)). Poor legislative drafting has consequences, and it is not the role of the Court to fix this. Under the statute as written, Mr. Curran has a terminal illness.

Under Appellees' interpretation of "terminal illness," the physician making the diagnosis must consider all potential medical interventions. This means one

[4] *See* AB at 15 (claiming that Appellants have "attempt[ed] to rewrite the law").

cannot be terminal unless there are no potential medical interventions that would result in a life expectancy of more than 6 months. This would exclude from EOLOA persons who, with life support, can have their life sustained for longer than 6 months. Appellees' interpretation of EOLOA's terminal illness definition would make EOLOA nearly meaningless because very few conditions prevent one's life from being sustained with life support. This was not how the statute was written.

Appellees next argue that Appellants' interpretation of the term "terminal illness" "wholly disregards the roles of the various medical providers involved." AB at 16. In short, Appellees want the Court to ignore the plain language of the definition and put its faith in the diagnosing physicians effectuating the law. Yet, as James Madison noted, "If men were angels, no government would be necessary." *The Federalist No. 51* (James Madison). To say that access is dependent on the purported good faith of medical providers making the decisions makes it all too clear that the Act lacks the appropriate safeguards.

Appellees further argue that "the standards of care for Mr. Curran's quadriplegia [do not] include[] a recommendation that he forgo medical support." AB at 17. First of all, Appellees do not know this. But even if it were true, there is no provision in the Act that limits terminal illnesses to those where a physician, using medical standards of care, recommends forgoing medical intervention. In fact, as pled in the Complaint, medical practice in states with assisted suicide has evolved

rapidly to include medical providers advocating for the use of Voluntary Stopping Eating and Drinking (VSED) so that patients not likely to die within 6 months can worsen their condition enough so that on a return visit they get the lethal drugs to kill themselves under EOLOA. A70 at ¶ 76, n.22 (citing EOLOA proponent endorsing VSED as "bridge" to assisted suicide for persons whose conditions are not currently life threatening). Medical standards of care are not static. They evolve. One of the harms of EOLOA is that it pushes standards of care towards new ways for providers to direct patients to death. The Complaint adequately pled this harm, and the District Court erred by disregarding the plain text of EOLOA.

**B. Mr. Curran's Injury is Not Speculative.**

Second, Appellees misstate the alleged harm and argue that Mr. Curran's injuries are too speculative. AB at 17-19. Mr. Curran is discriminated against due to the existence of that statute, which removes protections in the law for persons with suicidal ideations[5] solely on the basis of their disabilities. This discrimination is not

---

[5] Appellees argue that persons with suicidal ideations are likely not competent under EOLOA. AB at 18 n.3. This argument is nonsensical and completely circular. By definition, one must ideate, or think, about ending one's life to make a request under the Act. Appellees provide no clarity on how a medical professional could evaluate the difference between suicidal ideation and some other expression of interest in proceeding with assisted suicide. Moreover, as was pled in the Complaint:

> While the Act contains a requirement that the attending provider determine that the person has decision-making capacity, defined as the ability to understand and appreciate the nature and consequences of a particular health-care decision and to reach an informed health-care

merely Mr. Curran's feeling of discrimination. Under EOLOA, if Mr. Curran told a physician that he wanted to end his life, he would be walked through the process to obtain deadly drugs. Conversely, if a person who did not qualify under EOLOA said those same exact words, the physician would be obligated to protect the person from their suicidal ideation and could not prescribe life-ending drugs. The loss of this protection under Delaware law is a discriminatory harm suffered by Mr. Curran due to his disability.

Mr. Curran need not have the lethal pills in his hand to have Article III standing to challenge EOLOA. Federal disability law does not require Mr. Curran to wait until the harm has already occurred to bring a case for injunctive relief. Congress' use of broad language to outlaw discrimination in the ADA "demonstrates breadth" in the law's reach—and such breadth includes protections for those "at risk" of the harms of discrimination, not just those already harmed. *United States v. Fla.*, --- F.4th ---, 2026 WL 879178, at *13 (11th Cir. Mar. 31, 2026) (holding that persons at risk of harm from ADA violations have Article III standing to sue).

---

> decision, "[m]any physicians receive no formal training in capacity assessment and may hold erroneous beliefs about decisional capacity."

A92 at ¶ 135 (quoting Elissa Kolva, Barry Rosenfeld, & Rebecca Saracino, *Assessing the decision making capacity of terminally ill patients with cancer*, 26 AM J GERIATRIC PSYCHIATRY 5, 523-31 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6345171/).

**C. Mr. Curran Has Established Causation.**

Third, Appellees argue Mr. Curran cannot establish causation. AB at 19-20. This argument is rooted in a fundamental misstatement of Mr. Curran's alleged harm. The harm here is the discrimination against Mr. Curran and others who are similarly situated. Appellees' argument that Mr. Curran must argue a higher level of causation because he is not being directly harmed ignores the reality that Mr. Curran is being directly discriminated against by losing the benefits of Delaware's default anti-suicide programs. Mr. Curran's life-threatening disability has automatically qualified him under EOLOA.

Mr. Curran has standing to challenge the Act.

**D. The District Court Erred by Not Giving an Opportunity to Amend.**

As Appellants previously noted in their Opening Brief, the District Court erred by not giving any opportunity to amend. While Appellants established standing, the fact that the District Court *sua sponte* dismissed without further consideration was plain error. "'[I]n civil rights cases[,] district courts ***must offer amendment***—irrespective of whether it is requested—when dismissing a case for failure to state a claim[.]'" *LabMD Inc. v. Boback*, 47 F.4th 164, 192 (3d Cir. 2022) (quoting *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007)) (emphasis added).

Neither *LaSpina v. SEIU Pennsylvania State Council*, 985 F.3d 278, 291 (3d Cir. 2021), *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 113 (3d Cir. 2018), nor *Winslow v. Stevens*, 632 F.App'x. 721 (3d Cir. 2015) (cited at AB 21) are on point. *LaSpina* and *Vorcheimer* involve parties that had multiple opportunities to amend their complaints, and *Winslow* involved a *pro se* who filed multiple challenges to the same actions in state and federal courts. The District Court in this matter *sua sponte* dismissed without any discussion of leave to amend or any finding of futility.

## II. THE DISTRICT COURT ERRED BY FINDING THAT APPELLANT ORGANIZATIONS DID NOT HAVE STANDING TO BRING THE CLAIMS.

### STANDARD OF REVIEW

The parties agree that the standard of review on the standing determinations is plenary. AB at 12.

### DISCUSSION

Appellees concede that an organization has "standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the [organization or] association itself may enjoy" (AB at 22, quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)), and has associational standing where the organization's constituent members themselves have standing to assert the claims. *Id.* (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Because Appellant Organizations satisfy these standards, the District Court's *sua sponte* dismissal should be reversed and this case remanded.

**A. The Appellant Organizations Have Organizational Standing.**

Contrary to the District Court's erroneous finding that the Appellant Organizations' standing was premised simply on "[deep] concerns and abstract opposition" to the Act (A17), and Appellees' mischaracterization of Appellant Organizations' standing arguments (AB 24-27), the Act's impact on the Appellant Organizations is immediate, real, and concrete. The Appellant Organizations pled organizational standing in their Complaint and supported those allegations with their declarations submitted in support of the TRO Motion. *See, e.g.*, A51 at ¶ 25 (Delaware ADAPT stating that it was "divert[ing] already scarce resources to identify, investigate, and address EOLOA's impact on its constituents"); A56 at ¶ 42 (FCIL's statement that EOLA "facilitate[s] the deaths of constituents who would have sought out and benefited from FCIL's services"); A56 at ¶ 42 (NCIL: EOLOA poses a direct "threat both to the mission of the NCIL and to the well-being of the individuals and communities that NCIL serves"); A54 at ¶ 36 (United Spinal's statement that it is diverting resources "to inform its members concerning assisted suicide laws and their impact on equality, dignity, and access to care for people with disabilities").

Appellees try to characterize these allegations—which remain unrebutted—as little more than "ideological or abstract social interest." AB at 23. The harm alleged was much more than "'seeing' the law obeyed or a social goal furthered." *Am. Legal Found. v. F.C.C.*, 808 F.2d 84, 92 (D.C. Cir. 1987). Although Appellees want this Court to believe that the Appellant Organizations' standing arguments are little more than "twisted stretches of logic with leaps of reason, peppered liberally with keywords lifted from case law that is completely inapposite to their facts" (AB at 24), Appellees make no effort to describe precisely where these purported "twisted stretches of logic" or "leaps of reason" occurred.

To the contrary, the declarations provided by the Appellant Organizations were robust, providing factual details of the concerns and challenges facing the organizations. *See* OB at 20-21. The declarations described targeted outreach campaigns to address assisted suicide and efforts being made to provide alternatives to suicide for vulnerable constituents. *Id.* These same Appellant Organizations described the diversion of scarce resources away from core business activities—caring for the lives of disabled persons—in order to counter what is a direct threat to the devaluing of their members' lives and their civil rights. *Id.*

Additionally, statements were provided to the District Court of Appellant Organization members who were considering suicide as a means to cope with the daily challenges that they face in their lives. *See* OB at 22. For example, United

Spinal's representative stated, "Some members have been told by doctors that their condition is 'terminal,' and that they may have shortened amount of time to live—yet dire predictions are often proved wrong." A159 at ¶ 7. He further noted, "As a result of being perceived and labeled as terminally ill by their medical care providers, some of United Spinal's members will qualify for assisted suicide under the Act and are particularly vulnerable to being steered towards assisted suicide in a state of despair or depression." *Id.* at ¶ 8. Despite Appellees' pejorative descriptions of Appellants' response to these challenges as "bemoan[ing]" and "complain[ing]" (AB at 24-25), these challenges are not simply ideological objections. These are real organizations, spending real funds, and taking real time to deal with real harm directly stemming from the implementation of a dangerous and discriminatory act. Again, Appellees could have rebutted the declarations. They did not. Once again, "general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing. *Lujan*, 504 U.S. at 560.

Citing *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024), Appellees suggest that the Appellant Organizations have sought to spend their way into standing. AB at 26. Not so. Discrimination is the harm. Appellant Organizations have spent money to combat the discrimination resulting from the Act, but this is not the sole basis for standing. Instead, as several of the Appellant Organizations have made clear, they are acutely aware of the discrimination suffered

by their constituent members and have devoted themselves to fighting this discrimination whether it be through the provision of resources or other support. *See, e.g.*, A163 at ¶ 6 (NCIL Declaration: "NCIL has an interest in protecting the rights of disabled people to equal access offered to the general public. NCIL provides support to a network of CILs and SILs across the United States, who in turn provide, among other things, peer support, individual and systems advocacy, and independent living skills training."); A167-168 at ¶ 4 (IPR Declaration: "IPR advocates to protect individuals' rights in numerous healthcare contexts, including by providing information about the discriminatory effects of assisted suicide laws and the dangers those laws pose to vulnerable individuals; opposing discriminatory crisis standards of care … ; advocating against the use of the Quality Adjusted Life Year ("QALY") metric … ; educating the public about disparities in healthcare access and outcomes, including those based on race, age, and/or disability; and advocating for improvements to the quality of hospice and palliative care services, as well as for expanded access to these key services."). The challenges posed by EOLOA are not abstract concerns for the Appellant Organizations.

The unrebutted declarations are sufficient to establish standing. *See Lujan*, 504 U.S. at 561 ("on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'") (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)); *Newark Branch*,

*N.A.A.C.P. v. Town of Harrison*, 907 F.2d 1408, 1417 (3d Cir. 1990) (reversing and remanding to the district court to exercise discretion whether an amended complaint would cure organizational standing deficiency); *see also 1789 Foundation, Inc. v. Schmidt*, 2024 WL 4666300, at *8 (M.D. Pa. Nov. 4, 2024) (declining to dismiss on organizational standing grounds in absence of a motion to dismiss).

**B. The Appellant Organizations Have Associational Standing.**

"It has long been settled that even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 281 (1986) (cleaned up). The Appellant Organizations have sufficiently established associational standing through concrete examples of members at risk, such as Mr. Curran, Ms. McMullin-Powell, and other unnamed, but referenced, constituent members.

Although Appellees wave away United Spinal's members' vulnerability to being steered towards assisted suicide in a state of despair or depression (AB at 28-29), Appellees fail to address the immediate and ongoing discrimination the constituents of the Appellant Organizations face under the Act. *See* A155-56 (Delaware ADAPT Declaration) at ¶ 8 ("With what I myself and other members have experienced, the Act fosters further discrimination against us with disabilities").

The members of the Appellant Organizations are thus not "mere bystanders" to the discrimination caused by the implementation of the Act. *Bost v. Illinois State Bd. of Elections*, 607 U.S. ---, 146 S. Ct. 513, 520 (2026) (quoting *Diamond Alternative Energy, LLC v. Envtl. Prot. Agency*, 606 U.S. 100, 110 (2025)). The Act directly impacts the members of the Appellant Organizations, because the harm caused—discrimination—is a concrete injury. This was exactly the case as it relates to standing involving the Appellant Organizations. The District Court's error should be reversed.

## III. THE DISTRICT COURT ERRED WITH RESPECT TO ITS DENIAL OF THE TRO ON THE MERITS.

### STANDARD OF REVIEW

Appellants contend that this Court should review denial of the TRO for abuse of discretion under *National Land & Inv. Co. v. Specter*, 428 F.2d 91, 95 (3d Cir. 1970). AB at 32. The abuse of discretion would have applied had the District Court denied the TRO under the traditional factors for injunctive relief. Instead, however, the District Court went straight to the merits of the claims as if it had been presented with a Rule 12(b)(6) motion to dismiss for failure to state of claim. Therefore, the correct standard of review is the plenary standard that applies to such dismissals. *See Warren Gen. Hosp.*, 643 F.3d at 83 (citing *Lum v. Bank of America*, 361 F.3d 217, 223 (3d Cir. 2004)).

## DISCUSSION

The District Court erred by denying the TRO motion and dismissing the entire action on the merits. The District Court erred in both its analysis of the "Statutory Claims" (Count I (the ADA claim), Count II (the Rehabilitation Act claim), and Count III (the ACA claim)), and in its analysis of the "Constitutional Claims" (Count IV (the Equal Protection claim) and Count V (the Due Process claim)).

### A. This Court Has Jurisdiction to Review the District Court's Denial of the TRO Motion.

At the outset, Appellees argue that this Court is without jurisdiction to hear this appeal, stating, "It is well established that denials of temporary restraining orders are not ordinarily appealable." AB at 32 (citing *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1303-4 (1985)). While acknowledging the exception to the "general rule," Appellees claim that Appellants' appeal of the denial of the temporary restraining order does not come within the exception, but instead fits, "squarely within the general rule articulated by *Office of Personnel Management* because the court's denial of the TRO Motion was not case dispositive." AB at 33.

Appellees are wrong. The District Court made perfectly clear that it was reviewing Appellants claims "on the merits." *See* A20 ("Although the Court has determined that Plaintiffs lack standing, the Court will evaluate Plaintiffs' TRO Motion ***on the merits***.") (emphasis added). The denial of the TRO Motion was tantamount to dismissal of the case. *See Robinson v. Lehman*, 771 F.2d 772, 782

(3d Cir. 1985) ("The denial of a temporary restraining order is not generally appealable ***unless its denial decides the merits of the case or is equivalent to a dismissal of the claim***.") (citing 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2962 (1983)) (emphasis added). In *Robinson*, the Court made a determination based on the Court's "review of the record" that "the temporary restraining order in this action would not have decided the merits of the case nor would it have amounted to a dismissal" of the claim. 771 F.2d at 782-783.

In this case, a review of the record shows that the District Court's opinion on the TRO Motion was a decision on the merits and was tantamount to a dismissal of the claims at issue. The District Court analyzed each of the Complaint's counts under the ADA, the Rehabilitation Act, and the ACA, and erroneously determined that Appellants had failed to state a claim for each of these claims. *See* A20-23. The District Court then analyzed the Complaint's counts under the U.S. and Delaware State Constitutions and determined that the Complaint did not state claims for violation of the Equal Protection Clause or the Due Process Clauses. In short, the Court's analysis of the TRO Motion was a motion to dismiss analysis. This Court has jurisdiction to analyze the District Court's rulings and to reverse its analysis and remand the case.[6]

---

[6] Indeed, without a ruling by this Court, Appellants have concerns that a reversal of the District Court's analysis on standing and remand could lead to the District Court repeating its faulty analysis of the claims under Rule 12(b)(6).

### B. The District Court Erred by Deciding the TRO Motion on the Merits After Determining that Appellants Did Not Have Standing.

The District Court's decision could not be clearer that it was making a determination both as to standing ***and*** as to the merits of the claims: "Although the Court has determined that Plaintiffs lack standing, the Court will evaluate Plaintiffs' TRO Motion on the merits." A20. This was not as Appellees describe "an alternative ruling on the motion for a temporary restraining order." The implementing order (A4) made clear that the Court was issuing standalone rulings as to the standing question and the decision on temporary restraining order. *See* A4 (listing the rulings as standalone paragraphs (¶¶ 1 and 2), and not as alternative rulings). While the District Court's Memorandum Opinion does frame the decision on the temporary restraining order at A7 in the subjunctive ("even if there were standing …."), the District Court later couches its ruling on the TRO Motion as a standalone, not an alternative decision: "Although the Court has determined that Plaintiffs lack standing, ***the Court will evaluate Plaintiffs' TRO Motion on the merits.***" A20 (emphasis added).

Here is where the District Court ran afoul of this Court's precedent on standing. Once the District Court determined that there was no standing, there was no jurisdiction, and the evaluation of the TRO Motion ***on the merits*** was not proper. *See, e.g.*, *Light v. Davis*, 2024 WL 4144066, at *2 (3d Cir. Sept. 11, 2024) (citing *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 164 n.7 (3d Cir. 2017)). While nothing

prevents a Court from issuing an alternative ruling, the District Court's decision here does not appear to be an alternative ruling, but instead appears to be a separate standalone basis for disposing of the case.

Regardless, because the District Court did take on the issue of the merits—effectively converting a Rule 65 analysis into a motion to dismiss analysis—Appellants are seeking review of the merits of the claims. Again, as previously argued in the Opening Brief, the District Court's heightening of Appellants' burden by failing to give Appellants the benefit of the standard under Rule 12(b)(6) was plain error. *See* OB at 29-30 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), for the standard that "… a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is ***plausible*** on its face.'") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (emphasis added)). Appellees cannot deny that the District Court issued a ruling on the merits under the standard of Rule 65.

### C. The District Court Erred in Denying the TRO and Dismissing the Case Based on Its Review of the Merits.

Having taken on a merits-based review of the claims, the District Court's decision is ripe for review by this Court.

At the outset, Appellees jump ahead in their analysis and frame the challenge to the validity of the Act as a "facial challenge" that is "'hard to win.'" AB at 37 (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024)). While this may be

the case in broad constitutional challenges to expansive laws where the specific issues are not well defined, this is not the case here.[7] The analysis here of whether Appellants pled the elements of claims under the ADA, the Rehabilitation Act, and the ACA (*i.e.*, the Statutory Claims) is not "hard." As argued in the Opening Brief (OB at 30-36), these claims were established. Whatever may be said about the difficulty of establishing any of the Statutory Claims or the Constitutional Claims, Appellants satisfied their burden of pleading the claims.

**1. Statutory Claims.**

Appellees argue that Appellants' Statutory Claims fail because "the Act does not exclude anyone from any government program." AB at 39-40. Appellees oversimplify the argument. In *Durham v. Kelley*,[8] this Court stated that the third

[7] Appellees' citation of *Moody* is inapposite. There, the Supreme Court was analyzing a facial challenge to two state laws regulating online speech. The Court struggled somewhat with the application of the law since the parties focused on the application of the laws "to the curated feeds offered by the largest and most paradigmatic social-media platforms" when, in actuality, the law "might apply to, and differently affect, other kinds of websites and apps." *Moody*, 603 U.S. 717-18.

[8] 82 F.4th 217 (3d Cir. 2023). To state a claim under either the ADA or the Rehabilitation Act, a party must demonstrate: "(1) they are qualified individuals; (2) with a disability; and (3) they were excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or were subjected to discrimination by any such entity; (4) by reason of their disability." *Durham*, 82 F.4th at 225. Disability-discrimination claims under the ACA use the same analysis as a claim under either the ADA or the Rehabilitation Act. *Jones v. CVS Pharmacy, Inc.*, 2022 WL 4536124, at *5 n.2 (M.D. Pa. Sept. 28, 2022) (citing *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007)).

element of an ADA and Rehabilitation Act claim is that a person is "excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, ***or were subjected to discrimination by any such entity***." 82 F.4th at 225. The issue here is that persons with life-threatening disabilities are being treated decidedly different under EOLOA. While Appellees describe this as providing persons with terminal illnesses "with more rights and greater choice" (AB at 40), this is value-laden judgment of what the law offers. Appellants and other similarly-situated persons do not see easier access to death as a benefit, and being given the option to die is not a reasonable accommodation. Regardless, Appellants and their constituent members are treated differently than other Delawareans. This makes the Act facially discriminatory.

Next Appellees claim that the Act does not steer terminally-ill patients toward life ending decisions against their true interests. AB at 40. However, this was the core of Appellants' challenge which the District Court *sua sponte* dismissed. Appellants pled robust claims in the Complaint, citing a number of factual challenges to the Act and offering citations to medical practitioners regarding the consequences of moving forward with EOLOA. Appellees offered little more than the language of the Act. Appellants should have had the opportunity to present their arguments to the District Court—to marshall evidence and show that steering is a real risk. Unfortunately, the District Court took the Appellees at their word.

Appellees' *ipse dixit* assertion that the law would not be used to steer disabled persons towards assisted suicide is not evidence. Despite Appellees' claims that such arguments are "hypothetical" or "imaginary," the Appellees offered no rebuttal to the pleadings. Nothing was hypothetical or imaginary about the State's labeling of persons with life-threatening disabilities as suicide-qualified.

Finally, Appellees citation of the decision in *United Spinal Association v. California*, 2024 WL 1671167 (C.D. Cal. Mar. 27, 2024), as providing further support for the District Court's decision is decidedly weak. AB at 42-43. While there are similarities between California's and Delaware's versions of EOLOA, the District Court was in no way bound by the California court's decision. The California court there at least ruled that the organizational plaintiffs had standing. *Id.* at *4. This case is currently before the Ninth Circuit. *See United Spinal Assoc. v. California*, Case No. 24-04751 (9th Cir.).

The District Court erred in its review of the Statutory Claims.

**2. Constitutional Claims.**

Appellees further misapprehend Appellants' constitutional challenges to the Act. Appellees claim that this Court's decision in *Bryman v. Murphy*, "confirmed that the law [New Jersey's assisted suicide law] faces only a ***rational-basis review*** when evaluating an Equal Protection claim." AB at 5 (citing *Bryman v. Murphy*,

2025 WL 3493889, at *3 (3d Cir. Dec. 5, 2025)).[9] This is entirely inaccurate. The challenge in *Bryman* focused on whether out-of-state persons had a constitutional right to obtain access to New Jersey's assisted suicide laws. It was not, as claimed here, a challenge to the law as being discriminatory to persons with disabilities. In determining the standard to be applied, this Court decided that there was not a fundamental ***right of access*** to assisted suicide:

> There is no longstanding tradition of doctor-assisted suicide. ***On the contrary, there is a centuries-long tradition against it.*** That is why the Supreme Court rejected it as a fundamental right. *See Glucksberg*, 521 U.S. at 710-19, 117 S. Ct. 2258. *Glucksberg* likewise dooms any claim that doctor-assisted suicide is a traditional privilege. Whether a privilege requires more historical support than a fundamental right or less, this one—recognized in fewer than a quarter of the states—has not "at all times[ ] been enjoyed by the citizens of the several states." *Corfield*, 6 F. Cas. at 551. It is only "of relatively recent vintage." *McBurney*, 569 U.S. at 234, 133 S. Ct. 1709.

*Bryman*, 161 F.4th at 181. The question answered by the *Bryman* Court was exactly the opposite posed here. Appellants maintain that there is a fundamental right to life which is being impaired by Delaware's EOLOA.

Finally, with respect to the Equal Protection analysis, Appellees again miss the mark. Appellees argue that there is no issue with treating people who have a terminal illness (such as Appellants here) differently because "terminally ill EOLOA

[9] *Bryman* has now been reported at 161 F.4th 174.

patients face a distinctive prospect of pain and suffering associated with the dying process, along with heightened emotional anxiety related to that process." AB at 46. Once again, however, Appellees have made the argument for why this is discriminatory: Because persons with life-threatening disabilities are assumed to face a "prospect of pain and suffering" and "heightened emotional anxiety," Appellees solution is to automatically qualify such persons for state-sanctioned medically-provided suicide help. Even given the fact that Appellants have raised challenges to Appellees' spin on the facts (including the claim that assisted suicide is painless), there is no justification to automatically discriminate against disabled persons. Appellants here have justifiably expressed concerns about being labeled as incapable of addressing the prospect of pain and suffering. They do not want to be automatically labeled as terminally ill.

## CONCLUSION

For all these reasons, the District Court erred by *sua sponte* dismissing the Complaint. The Court should reverse the District Court's decision, and the case should be remanded to the District Court for further proceedings.

Date: April 15, 2026

Respectfully submitted,

**HALLORAN FARKAS + KITTILA LLP**

*/s/ Theodore A. Kittila*
Theodore A. Kittila
William E. Green, Jr.
5722 Kennett Pike
Wilmington, Delaware 19807
Tel: (302) 257-2025
Fax: (302) 257-2019
Email: tk@hfk.law | wg@hfk.law

-and-

Ernest J. Galvan
Michael W. Bien
**ROSEN BIEN GALVAN & GRUNFELD LLP**
101 Mission Street, Sixth Floor
San Francisco, California 94105
Tel: (415) 433-6830
Fax: (415) 433-7104
Email: egalvan@rbgg.com | mbien@rbgg.com

*Counsel for Appellants*

## **CERTIFICATION OF BAR MEMBERSHIP**

I hereby certify that this brief complies with 3d Cir. L.A.R. 46.1 as all of the attorneys whose names appear on the brief are members of the bar of this Court, and currently in good standing.

*/s/ Theodore A. Kittila*
Theodore A. Kittila

**CERTIFICATION OF COMPLIANCE**

1. This brief complies with the type-volume limits of Fed. R. App. P. 32(a)(7) because it contains 6,406 words, excluding the parts of the brief exempt by Fed. R. App. P. 32(f), as determined by the word-count function of Microsoft Word 2013.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2024 in 14-point Times New Roman font.

3. This brief complies with 3d Cir. L.A.R. 31.1(c) because: (1) the text of the electronic brief is identical to the text in the paper document; and (2) the document has been scanned for viruses with Microsoft Defender and no virus was detected.

*/s/ Theodore A. Kittila*
Theodore A. Kittila

## CERTIFICATION OF SERVICE IF REQUIRED

I hereby certify that, on April 15, 2026, the foregoing *Appellants' Reply Brief* was electronically filed with the Clerk of Court using the CM/ECF system.

*/s/ Theodore A. Kittila*
Theodore A. Kittila